IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL NO. 5:13cv007-RLV
(5:11cr23-RLV-DCK-2)

JASON SCOTT HOLBROOK,               )
                                    )
            Petitioner,             )
                                    )
    vs.                             )           **O R D E R**
                                    )
UNITED STATES OF AMERICA,           )
                                    )
            Respondent.             )
_____     )

**THIS MATTER** is before the Court on Petitioner's Motion to Vacate, Set Aside, or

Correct Sentence pursuant to 28 U.S.C. § 2255, (Doc. No. 1), and on the Government's Motion

for Summary Judgment, (Doc. No. 11).

## I.    BACKGROUND

### A. Law Enforcement Uncovers the Drug Conspiracy Involving Petitioner

On March 24, 2009, after two months of undercover cocaine buys and drug surveillance,

law enforcement agencies executed a search warrant at Petitioner Jason Holbrook's home in

Hamptonville, North Carolina.  See (Crim. No. 5:11cr23, Doc. No. 20 at 5-6: PSR).  The search

revealed 887.1 grams of powdered cocaine, 10.5 pounds of marijuana, drug paraphernalia, and

17 rifles and handguns.  (Id. at 6).  Law enforcement agents interviewed Petitioner, who

confessed to his involvement in drug trafficking.  (Id.).  Deciding to cooperate with the

Government, Petitioner disclosed other individuals involved in the drug conspiracy.  (Id.).

Nevertheless, he failed to mention the involvement of his father-in-law and co-conspirator Henry

Clay Randleman.  (Id.).

1

Shortly after execution of the search warrant, Petitioner retained Attorney Ray Chandler. See (Doc. No. 10-1 at 1). Petitioner was later arrested on state charges related to the search of his home. See (Doc. No. 10-2 at 1). This arrest prompted Attorney Chandler to reach out to Attorney Seth Johnson in Statesville, North Carolina, to assist with Petitioner's bond and to act as local counsel. (Id.). Attorney Johnson agreed to assist in Petitioner's case, and Petitioner retained him as counsel. (Id. at 2). Seven months after the search of Petitioner's home, a confidential informant (CI) disclosed to the Government that Petitioner and Randleman were still dealing drugs. (Crim. No. 5:11cr23, Doc. No. 20 at 7). The CI also disclosed that Petitioner told him that Randleman was his drug supplier and that Mexican Nationals dropped off the drugs at a barn at Petitioner's residence. (Id.). The next day, Randleman, alleged co-conspirator Randall Crater, and an undercover officer ("UO") met at a Bojangles in Jacksonville, North Carolina. (Id.). There, Randleman and the UO discussed the possibility of the UO supplying Randleman with large amounts of cocaine and marijuana. (Id.).

On November 18, 2009, a CI and a UO visited Randleman's home. (Id.). There, Petitioner and Randleman sold 222.4 grams of cocaine to the CI. (Id.). Two weeks later on December 2, 2009, Petitioner, again deciding it was to his advantage to cooperate with law enforcement, met with the Government. (Id. at 8). During the meeting, Petitioner admitted to years of drug trafficking. (Id.). He also implicated Randleman in the drug conspiracy, provided details about the drug-trafficking process, and disclosed Randleman's drug sources as Mexican Nationals. (Id.). In addition to identifying co-conspirators during his debriefing with the Government, Petitioner met with a potential target in an attempt to assist the Government. (Id., Doc. No. 32 at 10; 17: Tr. of Sent. Hrg.).

On February 2, 2010, Petitioner provided a non-attribution statement. (Id. at 9). In this

statement he again implicated Randleman, as well as several other individuals, in the drug conspiracy. At some point after the non-attribution statement, the Government expressed its concern to Attorneys Chandler and Johnson about Petitioner's lack of full cooperation, including his participation in side drug deals. (Doc. No. 10-1 at 5: Chandler Aff.; Doc. No. 10-2 at 3: Johnson Aff.). Several months thereafter, Petitioner requested that Attorney Chandler withdraw from representation. (Doc. No. 10-2 at 3; Doc. No. 10-3 at 1: Vannoy Aff.). Petitioner then hired Attorney John Vannoy as counsel. Petitioner continued to use the services of Attorney Johnson. (Id.).

Local law enforcement executed a search warrant at Randleman's home on November 16, 2010. (Crim. No. 5:11cr23, Doc. No. 20 at 12). As a result, numerous guns and documents were seized. (Id.). Law enforcement interviewed Randleman about his involvement in drug trafficking. (Id.). He was also questioned about his involvement with Mexican National drug suppliers. (Id.). Six days later, Randleman provided law enforcement with a non-attribution statement. (Id.). In this statement, he confessed to his involvement in drug trafficking. (Id.). Randleman also stated that Petitioner was heavily involved in the storing and distribution of cocaine and marijuana, especially over the past three to four years. (Id. at 13).

**B. Petitioner Enters a Guilty Plea**

On April 21, 2011, the Government filed a Bill of Information (BOI) in the Western District of North Carolina. (Id., Doc. No. 1: Bill of Information). The BOI charged Petitioner and Randleman with one count of conspiracy to possess with the intent to distribute a mixture or substance containing a detectable amount of cocaine and a mixture or substance containing a detectable amount of marijuana, in violation of 21 U.S.C. §§ 841(b)(1) and 846. See (Id.). The BOI also alleged that the offense occurred from about January 1, 2007, to November 22, 2010,

and involved at least five kilograms of a mixture or substance containing a detectable amount of cocaine and at least 100 kilograms of a mixture or substance containing a detectable amount of marijuana. (Id.). On May 18, 2011, Randleman entered a plea of guilty. See (Id., Doc. No. 2). On May 27, 2011, Petitioner's plea agreement was filed with the court, and a Rule 11 hearing was set for June 3, 2011. See (Id., Doc. No. 9). On June 3, 2011, Attorneys Johnson and Vannoy filed a notice of appearance on Petitioner's behalf.

Petitioner pled guilty on June 3, 2011. See (Id., Doc. No. 12: Acceptance and Entry of Guilty Plea). At the Rule 11 hearing, the magistrate judge advised Petitioner of the charges against him. The magistrate judge then asked Petitioner a series of questions, including whether Petitioner had enough time to discuss any possible defense with counsel and whether he was satisfied with counsels' services. See (Id.). Petitioner answered yes to both of these questions. (Id.). Based on the Court's inquiry, Petitioner's guilty plea was accepted. (Id.).

### C. Probation Files a Pre-Sentence Investigation Report

On August 22, 2011, the probation office filed a draft presentence investigation report (PSR). See (Id., Doc. No. 18). In it, the probation officer recommended a two-level enhancement for possession of a dangerous weapon in connection with the drug offense and a two-level enhancement for maintaining a premises for the purpose of manufacturing or distributing a controlled substance. (Id. at 16). The PSR also included a three-level reduction for acceptance of responsibility. (Id.). Thus, Petitioner was determined to have a total offense level of 35. (Id.). With a criminal history category II, Petitioner faced an advisory guideline range of 188 to 235 months of imprisonment. (Id. at 23). On September 9, 2011, Petitioner, through Attorney Vannoy, filed an objection to the draft PSR. See (Id., Doc. No. 19: Objection to PSR). Specifically, Petitioner objected to the two-level enhancements for possession of a

dangerous weapon (firearm) in connection the drug offense and the two-level enhancements for maintaining a residence for the purpose of distributing controlled substances. (Id.). The probation office issued a final PSR, which included the challenged enhancements. See (Id., Doc. No. 20). On November 20, 2011, Attorney Randolph Marshall Lee filed a notice of appearance on behalf of Petitioner. See (Id., Doc. No. 22). Ten days later, after speaking with Petitioner, Attorneys Vannoy and Johnson filed a motion to withdraw as Petitioner's counsel. See (Id., Doc. No. 23). The magistrate judge granted this motion. See (Id., Doc. No. 24).

**D. Government Files a Motion for Downward Departure**

Prior to Petitioner's sentencing hearing, the Government filed a motion for a downward departure from the applicable guideline range based on recognition of Petitioner's substantial assistance in the Government's investigation of the drug conspiracy. See (Id., Doc. No. 26). In its motion, the Government noted that Petitioner provided "proactive assistant [sic], informational debriefings, and willingness to testify against co-conspirators." (Id. at 2). Further, the Government highlighted Petitioner's immediate cooperation, which started a domino effect ultimately leading to the arrest and prosecution of several individuals, and the discovery of a methamphetamine lab in Georgia. (Id. at 3). Based on Petitioner's assistance, the Government recommended a 43% reduction in sentence, reducing Petitioner's sentence from 188 months (which was the low end of the Guideline range) to 108 months. (Id.).

**E. Petitioner is Sentenced**

Petitioner's sentencing hearing was held on January 9, 2012. At the outset of the sentencing hearing, the Court asked Petitioner if he was pleading guilty to the conspiracy count and if he understood the nature of the charge and the possible penalties. Petitioner responded, "I think so, your honor." (Id., Doc. No. 32 at 2-3: Tr. of Sent. Hrg.). Petitioner also stated that his

plea was free and voluntary and that he committed the offense, and he stipulated to the existence

of an independent factual basis to support his plea. (Id.). After the Court's preliminary inquiry,

Petitioner raised the same two objections to the PSR previously raised by Attorney Vannoy: (1)

the two-level enhancement for possession of a dangerous weapon (firearm) should not apply, and

(2) the two-level enhancement for maintaining a residence for the purpose of distributing

controlled substances should not apply. (Id. at 4). Regarding the "maintaining a residence"

objection, both the Government and Petitioner agreed that this enhancement was inapplicable

since Petitioner's conduct concluded before the enhancement was added to the Sentencing

Guidelines. (Id. at 4-5). As to the two-level enhancement for possession of a dangerous weapon,

the Court held that this enhancement was applicable. (Id. at 7). The Court also determined that a

three-level reduction for acceptance of responsibility was appropriate. (Id. at 5). Thus, it was

determined that Petitioner had a total offense level of 33 and a Guideline range of 151 to 188

months. (Id. at 8).

Next, the Court addressed the Government's motion for downward departure. (Id.). The

Government first orally amended its motion in light of the change in Petitioner's guideline range.

(Id.). It then recommended a 43% reduction of the 151-month sentence, making the base level

offense 30 and the recommended sentence 86 months. (Id.). After acknowledging the

Government's motion, Attorney Lee detailed Petitioner's cooperation with the Government. (Id.

at 9). Attorney Lee described Petitioner's cooperation as proactive, spanning roughly two-and-a-

half years. (Id.). He argued that during this time, Petitioner put his and his family's life in

danger to provide information to the Government that ultimately led to the prosecution of several

individuals, including Randleman. (Id. at 9-12). Attorney Lee suggested that the information

provided by Petitioner led to the discovery of a methamphetamine lab in Georgia and the arrest

of numerous individuals who were part of a larger drug conspiracy.  (Id. at 10-11).  Petitioner

then supplemented Attorney Lee's argument with discussions of his financial issues and his

familial relationships.  (Id. at 13-15).

In response, the Government shed light on the extent of Petitioner's cooperation.  The

Government noted that Petitioner helped law enforcement arrest one individual in connection

with the drug conspiracy and assisted law enforcement in getting Randleman to cooperate.  (Id.

at 17).  Nevertheless, the Government highlighted the fact that Petitioner's cooperation was

spotty during the Government's two-and-a-half year investigation and that Petitioner participated

in drug sales without permission from the Government during the alleged period of assistance.

(Id. at 16).  The Government clarified that while Petitioner started the "domino effect" that

ultimately led to the discovery of a large methamphetamine drug conspiracy, "he was not

personally involved in any of the proactive activities that resulted in [the arrest and prosecution

of individuals associated with the methamphetamine drug ring]."  (Id. at 17).  The Government

argued that Petitioner's cooperation, while significant, was not the foundation of the bulk of their

case against the "higher level players," and the larger drug seizures.  (Id.).  In fact, it was not

even the reason the Government was ultimately able to secure the cooperation of Randleman

since a co-conspirator, Randall Crater, did this.  (Id.).  After listening to both sides'

presentations, and reviewing the Government's written motion for downward departure, the

Court determined that a downward departure to an offense level of 27 was warranted.  (Id. at 20).

The Court sentenced Petitioner to 78 months of imprisonment, the low end of the guideline

range.  (Id. at 23).  Judgment as to Petitioner was entered on January 10, 2012.  (Id., Doc. No.

30: Judgment).  Petitioner did not appeal.

**F. Petitioner Files the Pending Motion to Vacate, Set Aside or Correct Sentence**

**under 28 U.S.C. § 2255**

On January 9, 2013, Petitioner timely filed the instant motion to vacate, set aside, or correct his sentence. In his motion, Petitioner alleges that during the Government's two-and-a-half-year investigation of Petitioner's involvement in the drug conspiracy, some, or all of his four retained attorneys, provided ineffective assistance of counsel. The ineffective assistance of counsel, Petitioner argues, resulted from his attorneys' having a personal and/or business relationship with Randleman and Crater. Petitioner believes that these relationships created a conflict of interest that prevented his attorneys from advising him to secure the cooperation of Randleman. Petitioner asserts that securing Randleman's cooperation would have resulted in a larger downward departure in Petitioner's sentence.

### G. Petitioner's Attorneys Submit Affidavits to the Government

Per the Government's request, the attorneys that represented Petitioner in his drug case before the sentencing hearing submitted affidavits in response to Petitioner's motion to vacate and in support of the Government's summary judgment motion. <u>See</u> (Doc. Nos. 10-1; 10-2; 10-3; and 10-4).

#### a. Ray Chandler

In his affidavit, Attorney Chandler recounts what led him to represent Petitioner. (Doc. No. 10-1 at 1: Chandler Aff.). He explains that Petitioner sought him out in late April 2009 based on Crater's recommendation. (<u>Id.</u>). Crater became familiar with Attorney Chandler after Attorney Chandler represented Crater's father several years before. (<u>Id.</u>). Attorney Chandler states that he knew Crater's mother and had spoken with Crater over the phone. (<u>Id.</u>). Nevertheless, he and Crater had seldom seen each other over the past few years. (<u>Id.</u>). Attorney Chandler recalls that Petitioner and Crater met him at his home in South Carolina sometime after

the March 24, 2009, search of Petitioner's home.  (Id.).  After conversing for some time, Attorney Chandler asked Crater to leave so that he and Petitioner could discuss Petitioner's case. (Id. at 2).

Attorney Chandler recalls that during the 90-minute discussion, Petitioner described the March 24 search of his home and detailed his involvement in drug trafficking.  (Id.).  This discussion comprised most of the interview.  (Id.).  Attorney Chandler also recalls Petitioner discussing his familial relationships, including the fact that his father-in-law Randleman was involved in the drug conspiracy.  (Id.).  Attorney Chandler states that he told Petitioner that if Petitioner wanted to seek assistance credit from the Government, he might have to provide information about Randleman.  (Id.).  Attorney Chandler notes that Petitioner "expressed reticence in involving Mr. Randleman, indicating that he was afraid that [Petitioner's] wife would leave him and take their son."  (Id.).  Attorney Chandler recalls that several days later, Petitioner met with him a second time to retain his services.  (Id. at 3).  This meeting was at Chandler's office in South Carolina.  (Id.).  Attorney Chandler states in his affidavit that "[a]t no time [during this meeting] was I advised that Clay Randleman was the source of [my attorney's fee], nor did I have any reason to believe he was the source of those funds."  (Id.).  Moreover, Attorney Chandler notes that at the first meeting he did not know nor had he met Randleman. (Id. at 2).  It was after this meeting that Petitioner retained Attorney Chandler.  (Id.).

Attorney Chandler relays that after Petitioner's office visits he asked Attorney Johnson in Statesville, North Carolina to be local counsel.  (Id.).  He also spoke with Agent David Ramsey, the investigating agent on the case.  (Id. at 3).  Attorney Chandler recalls speaking with Agent Ramsey and learning that Randleman, not Petitioner, was a target in the investigation.  (Id.). Agent Ramsey suggested to Attorney Chandler that Petitioner should consider providing

information on Randleman or Randleman's drug sources, so that Petitioner could get cooperation assistance and be "early in" when Randleman was arrested. (Id. at 3-4).

In his affidavit, Attorney Chandler recalls a third meeting where Randleman accompanied Petitioner. (Id. at 4). Attorney Chandler notes again that at no time during this meeting, which again took place at his home in South Carolina, was he advised that Randleman was paying any portion of Petitioner's attorney's fee. (Id.). Further, Randleman did not ask Attorney Chandler to do anything regarding Petitioner's case. Attorney Chandler states that he advised Petitioner that he was uncomfortable discussing Petitioner's case with Randleman. (Id.).

Attorney Chandler remembers having a similar discussion with Petitioner after his wife accompanied him to several meetings at Attorney Johnson's office. (Id.). Attorney Chandler expressed concerns about the wife's attendance since he was convinced Randleman would be informed of their conversations. (Id.). Attorney Chandler next describes several discussions he had with the United States Attorney's Office (USAO) regarding Petitioner's case. (Id.). He first discusses conversations he had with the USAO about Petitioner's debriefing. (Id.). During the debriefing, Petitioner discussed Mexican mobsters and threats made against his family. (Id.). Attorney Chandler recalls that the information provided by Petitioner did not satisfy Agent Ramsey, who was looking for specifics. (Id.). Attorney Chandler says that "[h]aving failed at getting [Petitioner] to debrief in detail about his father-in-law and/or the Mexicans," he then convinced Petitioner to provide detailed information and/or participate in drug buys with drug dealers Agent Ramsey was interested in. (Id. at 5). Petitioner agreed to do this. (Id.). Attorney Chandler recalls Petitioner being debriefed over several hours about three individuals and participating in a drug buy. (Id.). Attorney Chandler says that it was his hope and plan that this cooperation would be enough for Petitioner to receive a downward departure if prosecuted

10

federally or credit if prosecuted by the State.  (Id.).

In his affidavit, Attorney Chandler says that several weeks later he was contacted by the USAO, who advised that they no longer wanted to work with Petitioner because he "had been drinking and running his mouth," "had gone off the reservation," and "had participated in the sale of drugs [without Government approval]."  (Id.).  All of this destroyed Petitioner's credibility.  (Id.).  Attorney Chandler remembers advising Petitioner that his case would be prosecuted by the State, which upset Petitioner.  (Id.).  Attorney Chandler recalls receiving a letter from Attorney Dudley Witt shortly after that conversation, stating that Attorney Chandler had a conflict of interest with Petitioner and Crater.  (Id. at 6).  Finally, Attorney Chandler notes that he advised Petitioner at all times to tell the truth and that he never told Petitioner to withhold any information he knew about any individual.  (Id.).  Attorney Chandler states he did not converse with Petitioner after he received the letter from Attorney Witt and that he was not aware that Randleman or Petitioner were prosecuted federally.  (Id.).

### b. Seth Johnson

Attorney Johnson states in his affidavit that in July 2009, Attorney Chandler reached out to him to help Petitioner obtain a bond in both Iredell and Yadkin Counties.  (Doc. No. 10-2 at 1: Johnson Aff.).  Attorney Johnson notes that he only agreed to represent Petitioner for bond purposes at that time.  (Id.).  Attorney Chandler's office paid Attorney Johnson $7,000 to assist Petitioner.  (Id.).  Attorney Johnson says that he, with the help of another attorney in the area, was able to assist Petitioner in making bond.  (Id.).

Attorney Johnson recalls meeting with Petitioner and Attorney Chandler shortly thereafter to discuss Petitioner's case, as well as Attorney Johnson's role in Petitioner's representation.  (Id. at 2).  Attorney Johnson notes that Attorney Chandler was very familiar with

the facts and circumstances surrounding the case. (Id.). Attorney Johnson also notes that all involved were under the impression that a federal indictment was likely. (Id.). Attorney Chandler gave Attorney Johnson $10,000 to act as local counsel. (Id.).

In his affidavit, Attorney Johnson states that he hired a private investigator to assist with the case and that he, Petitioner, and Attorney Chandler met with the private investigator on several occasions. (Id.). Attorney Johnson also remembers Attorney Chandler arranging for Petitioner to take a polygraph test to determine the truthfulness of Petitioner's information. (Id.). Attorney Johnson believed that Attorney Chandler's strategy for Petitioner's case was to have Petitioner cooperate with the Government. (Id.).

Attorney Johnson next details his discussions with the Government. In particular, he recalls a meeting on February 2, 2010, which included Agent Ramsey. (Id.). At this meeting, it was discussed whether Petitioner would provide information about Randleman. (Id.). Attorney Johnson recalls Petitioner struggling with this decision due to his family ties. (Id.). Attorney Johnson notes that the private investigator was in periodic contact with Agent Ramsey since both the private investigator and Agent Ramsey worked together in the past and this would be a more productive arrangement. (Id.).

Attorney Johnson recalls that the Assistant United States Attorney (AUSA) handling the matter at that time became involved in Petitioner's debriefings. (Id.). Attorney Johnson states that he and Attorney Chandler discussed with the AUSA Petitioner's level of cooperation and how this would affect Petitioner's sentence. (Id.). Attorney Johnson says that a meeting was set up between the AUSA, Agent Ramsey, and Petitioner, but that Petitioner was still involved in selling controlled substances, which concerned the Government. (Id.). Attorney Johnson also recalls a plea offer being discussed but remembers the Government not wanting to agree that

Petitioner fully cooperated with the Government.  (Id. at 3).  Thus, no agreement was reached. (Id.).  Attorney Johnson believed that it was because Petitioner was still involved in drug deals that the AUSA did not want to agree that Petitioner cooperated or to recommend a level of departure.  (Id.).  Attorney Johnson also remembers that sometime after the meeting, the AUSA declined federal prosecution.  (Id.).  He notes that it was around that time that Attorney Chandler and Petitioner parted ways.  (Id.).

After Attorney Chandler terminated his representation of Petitioner, Petitioner asked Attorney Johnson to act as lead counsel.  (Id.).  Attorney Johnson remembers expressing to Petitioner his discomfort in acting as lead counsel but agreed to assist Petitioner's new counsel, given his familiarity with the case.  (Id.).  Attorney Johnson informed Petitioner that his fee was $5,000 to provide consultation and remembers Petitioner paid this fee in cash.  (Id.).  Attorney Johnson states in his affidavit that Petitioner hired Attorney Vannoy as lead counsel.  (Id.).  It was around this same time that a new AUSA began handling the matter and decided to prosecute the case federally.  (Id.).  Attorney Johnson remembers he and Attorney Vannoy negotiating a plea agreement on behalf of Petitioner.  (Id.).  The agreement was filed on June 3, 2011.  (Id.). Attorney Johnson says that before sentencing he was notified by ECF that another attorney had entered the case.  At that time, he and Attorney Vannoy met with Petitioner and decided to withdraw as counsel.  (Id.).

Attorney Johnson concludes his affidavit by stating that he did not know Randall Crater's role in the drug conspiracy and only heard Crater's name mentioned by Petitioner and Attorney Chandler on occasion.  (Id. at 4).  Nevertheless, he did not think it was relevant to their defense strategy for Petitioner since the strategy was developing Petitioner's cooperation with the Government.  (Id.).  Attorney Johnson also states that he was not involved in Attorney

Chandler's representation of Petitioner in an unrelated insurance matter.  (Id.).

### c. John G. Vannoy, Jr.

Attorney Vannoy states in his affidavit that he first met Petitioner in September 2010. (Doc. No. 10-3 at 1).  Attorney Vannoy recalls that Petitioner's state charges were still pending at the time that Petitioner and Attorney Chandler had decided to part ways.  (Id.).  Petitioner retained Vannoy for a fee of $15,000 to represent Petitioner on his state charges in Yadkin County.  (Id.).  Attorney Vannoy remembers being paid $1,000 by Petitioner and $14,000 by an individual named Vickie Pinnix.  (Id.).  Attorney Vannoy conveys that during the course of his representation, he became aware that the USAO was going to prosecute the case, at which time he agreed to represent Petitioner on his federal charges.  (Id. at 2).  Attorney Vannoy recalls that Petitioner was charged by Bill of Indictment in federal court on April 21, 2011, and that Petitioner signed a plea agreement, which was filed on June 3, 2011.  (Id.).  Attorney Vannoy says that at that time, he and Attorney Johnson were representing Petitioner.  (Id.).  Attorney Vannoy articulated that between the plea hearing and sentencing, Petitioner hired Attorney Randolph Lee to represent him.  (Id.).  Attorneys Vannoy and Johnson withdrew as Petitioner's attorneys on November 30, 2011.  (Id.).

Attorney Vannoy conveys in his affidavit that he had no conversations or relationship with Attorney Chandler during his representation of Petitioner.  (Id.).  Moreover, Attorney Vannoy has no knowledge of Attorney Chandler being involved in any aspect of Petitioner's case once he was retained.  Therefore, Attorney Chandler could not have been "lead" attorney after Attorney Vannoy was retained.  (Id.).  Attorney Vannoy expresses that he hoped that Petitioner would receive collateral credit for the assistance that Randleman was providing the Government but that neither he nor Attorney Johnson were involved in any cooperation or

assistance provided by Randleman. (Id.). Further, Attorney Vannoy states that he never advised

Petitioner not to tell Randleman that Petitioner had implicated him in the drug conspiracy. (Id. at

3). He also adds that he was not involved in Petitioner's civil claims against Attorney Chandler.

(Id.).

### d. Dudley Witt

In his affidavit, Attorney Dudley Witt states that he first met Petitioner and Randleman

on September 30, 2010. See (Doc. No. 10-4 at 1: Witt Aff.). Petitioner and Randleman retained

him in a civil matter against Crater related to claims that Crater received money from Petitioner

and Randleman under false pretenses. (Id.). Petitioner also provided Attorney Witt with a copy

of a letter he received from Attorney Chandler regarding attorney's fees related to Petitioner's

then state charges and an unrelated insurance claim. (Id.). During the meeting, Attorney Witt

discovered that Petitioner had filed for bankruptcy. (Id. at 2). Attorney Witt advised Petitioner

that someone other than Petitioner would have to pay his attorney's fees since Petitioner was in

bankruptcy. (Id.). He also advised that any claims that Petitioner decided to pursue would have

to be pursued by the bankruptcy trustee. (Id.). After reviewing the letter from Attorney

Chandler that Petitioner provided, Attorney Witt believed that there were potential issues

associated with Attorney Chandler's representation of Petitioner in his insurance claim and was

concerned that Attorney Chandler had engaged in the unauthorized practice of law in North

Carolina. (Id.). Attorney Witt executed a fee contract for $5,000 on October 1, 2010, which

certified that the funds paid were from Randleman as an advance on behalf of Petitioner. (Id.).

Attorney Witt states that on October 6, 2010, he sent a letter to Attorney Chandler

requesting information related to Attorney Chandler's services rendered to Petitioner. (Id. at 3).

Although Attorney Chandler did not respond to Attorney Witt's correspondence, Attorney Witt

did receive a letter from David Holler stating that Attorney Chandler was licensed to practice law in North Carolina. (Id.). Attorney Witt was also told that the information he requested could not be provided without written authorization from Petitioner. (Id.). Attorney Witt recalls that he responded to Holler's letter by sending documentation showing that he conducted a search on the North Carolina State Bar website for Attorney Chandler, but the search yielded no results. (Id.). He also sent the written authorization obtained from Petitioner to both Mr. Holler and Attorney Chandler. (Id. at 4). He did not receive a response. (Id.).

Attorney Witt recalls being contacted by Petitioner's bankruptcy trustee to discuss Petitioner's civil claims, and it was decided that the matter would be pursued through bankruptcy court. (Id.). Attorney Witt recounts working with Petitioner's bankruptcy trustee to pursue Petitioner's claims against Attorney Chandler. (Id.). Attorney Witt conveys in his affidavit that after investigating Petitioner's claims against Attorney Chandler and Crater, it was his opinion that there was not enough evidence to pursue the claim against Crater. (Id. at 5). Attorney Witt also relays that it was his law firm's general practice to advise clients that it is not in their best interest to pursue civil claims while there are criminal charges pending against them. (Id.). Attorney Witt did think, however, that Petitioner had viable claims against Attorney Chandler. (Id.).

Attorney Witt admits that a partner at his law firm represented Randleman in connection with Randleman's pending state charges, but adds that he, Attorney Witt, was not involved with that case and was unaware of any cooperation by Randleman. (Id. at 5-6). Further, Attorney Witt notes that Petitioner did advise him that he had been indicted by the State, but that Attorney Witt was not involved in that matter since he knew Attorney Vannoy and was confident in his representation of Petitioner. (Id. at 6). Attorney Witt was unaware of any ongoing federal

investigation of Petitioner or of Petitioner's cooperation with the federal government other than a meeting Petitioner had with the Government before Attorney Witt's representation.  (Id.).

Attorney Witt states that he received a letter from Petitioner requesting information. (Id.).  The letter was followed by a phone call form Attorney Lee.  (Id.).  Attorney Witt advised Attorney Lee of his issues with Attorney Chandler and stated that he would check on his request to Attorney Chandler for information.  (Id.).  Attorney Witt denies any assertion that Attorney Chandler was the "lead" attorney on any matter he was handling for Petitioner, particularly since he still has not received the information he requested from Attorney Chandler.  (Id. at 7). Additionally, Attorney Witt provided a number of exhibits including letters, facsimiles, and bankruptcy documents as exhibits to his affidavit.

## II.  STANDARD OF REVIEW

### A.  Section 2255

Pursuant to Rule 4(b) of the Rules Governing Section 2255 Proceedings, sentencing courts are directed to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings" in order to determine whether a petitioner is entitled to any relief.  If a petitioner's motion survives initial review and once the Government files a Response, the Court must then review the materials submitted by the parties to determine whether an evidentiary hearing is warranted under Rule 8(a) of the Rules Governing Section 2255 Proceedings.  After having considered the record in this matter, including the parties' summary judgment materials, the Court finds that this matter can be resolved without an evidentiary hearing.  See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

### B.  Summary Judgment

Summary judgment is appropriate in those cases where there is no genuine dispute as to any

material fact, and it appears that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c)(2); United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991). Any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). Where, however, the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

## III. DISCUSSION

### A. Ineffective Assistance of Counsel

Petitioner contends that he received ineffective assistance of counsel based on his attorneys' alleged conflict of interest due to their alleged personal and/or business relationships with Randleman and Crater. The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions the accused has the right to the assistance of counsel for his defense. See U.S. CONST. amend. VI. To show ineffective assistance of counsel, Petitioner must first establish deficient performance by counsel and, second, that the deficient performance prejudiced Petitioner. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). In making this determination, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689; see also United States v. Luck, 611 F.3d 183, 186 (4th Cir. 2010). Furthermore, in considering the prejudice prong of the analysis, the Court "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)). Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice." Bowie v. Branker, 512 F.3d

112, 120 (4th Cir. 2008). If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong." United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), opinion vacated on other grounds, 218 F.3d 310 (4th Cir. 2000).

A defendant's right to effective assistance under the Constitution includes "a right to counsel unhindered by conflicts of interest." Mickens v. Taylor, 240 F.3d 348, 355 (4th Cir. 2001). Thus, an ineffective assistance of counsel claim may be premised on a petitioner's assertion that his attorney's conflict of interest caused inadequate representation. In those cases, the district court applies the standard outlined in Cuyler v. Sullivan, 446 U.S. 335 (1980). In Sullivan, the Supreme Court addressed a situation like the one here, where the defendant failed to notify the trial court of his attorney's alleged conflict of interest, and later asserted that he received ineffective assistance of counsel because of the conflict. The Court held that deficiencies in an attorney's performance are presumed to be unconstitutional if the petitioner shows that the attorney (1) had an actual conflict of interest and (2) that conflict of interest adversely affected the attorney's performance. Sullivan, 446 U.S. at 349. If both of these elements are met, then prejudice is presumed. (Id.).

**1. Whether Petitioner has shown an actual conflict of interest by his attorneys**

An actual conflict of interest arises when an attorney fails to follow a course of conduct for his client because it would adversely affect a person who has a conflicting interest. United States v. Tatum, 943 F.2d 370, 376 (4th Cir. 1991). Possible or potential conflicts of interest are insufficient to satisfy the requirement under Sullivan. Sullivan, 446 U.S. at 350 (holding that "the possibility of a conflict is insufficient to impugn a criminal conviction"). Rather, counsel must have "actively represented conflicting interests" for a court to find that there is an actual conflict. (Id.). For the following reasons, Petitioner has not shown that any of his attorneys had

an actual conflict of interest.

First, there is no actual conflict of interest because Petitioner has failed to show how his attorneys' prior (or allegedly prior) relationship with Randleman and Crater amounted to an actual conflict of interest. As to Attorney Chandler, Petitioner asserts that Crater, Randleman, and Crater and Randleman's friend Lee Butler recommended Attorney Chandler to him. Petitioner asserts that Attorney Chandler had a previous business relationship with Randleman and Crater. While Attorney Chandler admits in his affidavit to knowing Crater before representing Petitioner, Attorney Chandler states in his affidavit that he has never met Butler and that he did not know Randleman at the time he was retained by Petitioner. (Id. at 1-2). Although Attorney Chandler knew Crater before being retained by Petitioner, Petitioner was aware of this since it was Crater who recommended Attorney Chandler to Petitioner. Moreover, Attorney Chandler states in his affidavit that he saw Crater very rarely over the last few years, although he had spoken with Crater over the phone. This suggests that there was not a strong personal or business relationship between Crater and Attorney Chandler.

There is also no evidence in the record, and Petitioner has neither proffered evidence nor alleged, that Attorney Chandler knew that Crater was involved in the drug conspiracy, was being investigated by federal authorities, or was working with federal authorities. In fact, Attorney Chandler states in his affidavit that he had no "knowledge of Mr. Crater participating with the Federal authorities on behalf of Mr. Randleman or anyone else." (Doc. No. 10-1 at 6). Unless Attorney Chandler knew of the conflict, he could not make a choice between alternative courses of action depending on whether to favor Petitioner or Crater. See United States v. Hopkins, 43 F.3d 1116, 1119 (6th Cir. 1995) ("A conflict is hypothetical where . . . the attorney does not in fact know of the conflict . . . . Unless the attorney knows of the conflict, he or she cannot make a

20

choice between alternative courses of action depending on which client is to be favored."). Furthermore, Petitioner has not shown that an alleged, previous business relationship between Attorney Chandler, Crater, and Randleman created an actual conflict of interest in the criminal case, as Petitioner has presented no evidence that Attorney Chandler had a "substantial personal interest" in the business venture or that the business venture was ongoing at the time he represented Petitioner.

In addition to the fact that the record evidence shows that Attorney Chandler did not have a conflict of interest with Petitioner and Crater, the evidence also shows that Attorney Chandler did not have a conflict of interest with Petitioner and Randleman. In addition to Attorney Chandler's statement that he did not know Randleman before he was retained by Petitioner, Attorney Chandler goes on to say that he warned Petitioner not to include Randleman or Petitioner's wife (Randleman's daughter) in Petitioner's and Attorney Chandler's attorney-client meetings, and that he was unaware if his attorney's fees were paid by Randleman. (Id. at 3-4). Not only do these facts demonstrate that Attorney Chandler did not have a conflict, but they also demonstrate that he was affirmatively acting to protect Petitioner's interests.

Next, as to Petitioner's other attorneys, neither Attorneys Johnson nor Vannoy, who were lead counsel on Petitioner's criminal matter, knew Crater, Randleman, or Butler before representing Petitioner. Additionally, there is no evidence that Attorney Witt's joint representation of Petitioner and Randleman on unrelated civil claims against Chandler and Crater while another attorney at his law firm represented Randleman on his criminal charges created a conflict of interest affecting Petitioner's federal sentence. Attorney Witt admits to representing Petitioner in a civil matter against Attorney Chandler related to an insurance claim, and to jointly representing Petitioner and Randleman in civil claims against Crater regarding a business

21

venture.  Petitioner has neither alleged nor produced evidence, however, showing that the business venture or the insurance claim related to Petitioner's or Randleman's federal charges. Further, Petitioner has not alleged that Randleman and Petitioner had divergent interests concerning their civil claims that would have created a conflict of interest.  Although another attorney at his law firm represented Randleman on state charges, Attorney Witt affirms in his affidavit that he was not involved in the representation of Petitioner or Randleman as to their criminal charges.  Thus, it is unclear how Attorney Witt could have had an actual conflict of interest, particularly since he did not actively represent Petitioner's or Randleman's interests in the criminal charges.

Next, as to Petitioner's allegations regarding Randleman's payment of his attorneys' fees, even if Crater or Randleman paid all of Petitioner's attorneys' fees, there is no evidence or allegation that, with the exception of Attorney Witt, any of the attorneys knew that the money came from Crater or Randleman or that Crater or Randleman instructed any of the attorneys regarding their representation of Petitioner.  United States v. Tolson, 372 F. Supp. 2d 1, 15 (D.D.C. 2005) (noting that the attorney did not have an actual conflict of interest as "there is no evidence and no proffer of any evidence to demonstrate that [the coconspirator] ever gave [the attorney] any sort of instruction regarding [the attorney's] representation of [the defendant].").  Solely paying a co-defendant's attorney's fees, without more, is insufficient to show there was an actual conflict of interest.  Familia-Consoro v. United States, 160 F.3d 761, 766 (1st Cir. 1998) ("[T]hat a possible co-perpetrator pays a defendant's legal fees does not, without more, demonstrate that a real conflict tainted the representation he or she received.").

Finally, both the record and evidence demonstrate that the attorneys advocated strongly in their representation of Petitioner.  Attorneys Chandler, Johnson, and Vannoy pursued a plea

agreement on behalf of Petitioner that included a cooperation provision.  Similarly, the fact that Petitioner received a plea agreement that included a cooperation provision and received a significant downward departure for assisting the Government in prosecuting Randleman suggests that his attorneys were very unlikely to have been acting to advance Randleman or Crater's interests by inhibiting Petitioner from cooperating with the Government.  Accord Tolson, 372 F. Supp. 2d at 16 (holding that "active pursuit of a plea agreement including a cooperation provision . . . seems to give rise to the . . . inference . . . that [the attorney] is quite unlikely to have been acting to advance [the coconspirator's]interests by pushing [the defendant] to enter into a plea agreement and cooperate with the Government").  A review of the transcript from Petitioner's sentencing hearing shows that one of the many factors considered in awarding Petitioner a downward departure was the fact that he provided information against Randleman. It is simply incredible to assert that Petitioner's attorneys had loyalties to Petitioner's codefendants–specifically, Randleman–and yet, while under their counsel, allowed Petitioner to provide a level of cooperation against his co-defendant substantial enough to warrant an almost 50% reduction in sentence (from 151 months to 78 months).  It would also be illogical to find Attorney Chandler had a conflict of interest that favored Randleman when, as he states in his affidavit, Attorney Chandler made efforts to prevent Randleman from obtaining information relating to his representation of Petitioner, even taking steps to caution Petitioner about including third parties in his meetings with his attorneys.  In sum, after reviewing the record and assessing the evidence and allegations, Petitioner has failed to show any actual conflicts of interests by his attorneys.

**2. Whether any alleged conflict of interest adversely affect the representation of Petitioner**

The Court further finds that, even if Petitioner could show that an actual conflict of interest existed (which he cannot), he still cannot show that any conflict of interest adversely affected counsels' representation of him. To show that an attorney's conflict of interest adversely affected the representation of his client: (1) the petitioner must identify a reasonable strategy or tactic that his attorney could have applied; (2) the petitioner must show that the alternative strategy or tactic was "objectively reasonable" in light of the facts and circumstances known to his attorney at the time; and (3) the petitioner must show that his attorney's failure to pursue that strategy or tactic was linked to the actual conflict. <u>Mickens v. Taylor</u>, 240 F.3d 348, 361 (4th Cir. 2001). Petitioner alleges in his petition that, but for his attorneys' conflicts of interests, he would have been advised to obtain Randleman's cooperation, which Petitioner believes would have allowed him to obtain a greater downward departure and consequently a lower sentence. This argument fails.

Here, the defense strategy that Petitioner alleges his attorneys should have applied is the strategy that the attorney did in fact try to apply: cooperation. If this strategy was unsuccessful, then it was Petitioner's own fault, due to his unwillingness to implicate his father-in-law and by engaging in side drug deals. In his affidavit, Attorney Chandler states that when he first met with Petitioner, he told him "it was quite possible down the road that Mr. Randleman would be the subject of questions raised to him in the event that [they] got into circumstances where he needed to seek assistance from the Government." (Doc. No. 10-1 at 2). Attorney Chandler recalled that Petitioner "expressed reticence" about discussing Randleman because Petitioner was concerned that his wife (Randleman's daughter) and son would leave him. (<u>Id.</u>). Attorney Chandler also mentioned another time when he suggested to Petitioner that Petitioner "might provide significant information to help himself, either on Mr. Randleman or Mr. Randleman's

connections who were providing drugs," but that Attorney Chandler was ultimately unable to convince Petitioner to provide detailed information about Randleman's involvement. (Id. at 3-5). Furthermore, Attorney Johnson alluded in his own affidavit to the difficulty of getting Petitioner to cooperate against Randleman, stating "[t]he issue of whether or not [Petitioner] was willing to provide information regarding Clay Randleman was discussed . . . . It was a decision [Petitioner] struggled with because of his family connection." (Doc No. 10-2 at 2).

Contrary to Petitioner's claim that he wanted to provide information about Randleman but was encouraged not to do so by his attorneys, the record evidence shows that the attorneys tried to encourage Petitioner to provide information about Randleman but that Petitioner was hesitant to do so because of family ties. This is particularly true in light of the fact that Petitioner received a plea agreement including a cooperation provision that the Government did not want to include in the first plea agreement and the fact that Petitioner received a downward departure that reduced his sentence by almost 50% (from 151 months to 78 months). Although the Government mentioned the fact that Petitioner was not the person who secured Randleman's cooperation as one of the reasons they did not recommend a greater downward departure, the Government also detailed numerous other reasons that Petitioner should not receive a greater downward departure, including inconsistent cooperation, side drug deals, and the fact that Petitioner's information was not the foundation of the Government's arrest of the larger players or the large drug seizures. See (Crim. No. 5:11cr23, Doc. No. 32 at 16-17). Furthermore, the Court, in determining what sentence to apply, made no mention of Petitioner's failure to obtain Randleman's cooperation, but the Court did note the Government's assertion of Petitioner's somewhat limited cooperation. (Id. at 18-19).

In sum, the evidence does not show that Petitioner's attorneys had a conflict of interest or

that any alleged conflict of interest adversely affected Petitioner.  Rather, the evidence shows that, partially as a result of the strong advocacy of counsel, Petitioner received an almost 50% reduction in his sentence.  The fact that Petitioner received a significant downward departure in recognition of the substantial assistance he provided to the Government demonstrates that the cooperation strategy employed by counsel was successful.  In sum, Petitioner's ineffective assistance of counsel claim is without merit and the petition will therefore be dismissed.  To this extent, the Court grants summary judgment to Respondent.

## IV.    CONCLUSION

For the reasons stated herein, the Court will dismiss the § 2255 petition and grant Respondent's motion for summary judgment.

**IT IS, THEREFORE, ORDERED** that:

1.    Petitioner's § 2255 motion to vacate, (Doc. No. 1), is **DENIED** and **DISMISSED**.

2.    The Government's Motion for Summary Judgment, (Doc. No. 11), is **GRANTED**.

3.    Pursuant to Rule 11(a) of the Rules Governing Section 2255 Cases, this Court declines to issue a certificate of appealability as Petitioner has not made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); Miller–El v. Cockrell, 537 U.S. 322, 336-38 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong).

Signed: August 26, 2014

Richard L. Voorhees
United States District Judge